IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-00051-CNS-SKC

DENNIS MUNDT, individually; and
DENNIS MUNDT, as next friend and parent of D.J.M., a minor child,

      Plaintiffs,

v.

CAMILLE GADZIALA, in her individual capacity; and
JOI JOHNSON, in her individual capacity,

      Defendants.

---

## ORDER

---

      This matter comes before the Court on Defendants' Motion to Dismiss Complaint (ECF No. 9). For the following reasons, the motion is GRANTED. Defendants' related Motion to Stay Discovery Pending Immunity Determination (ECF No. 12) is DENIED AS MOOT.

## I. BACKGROUND[1]

D.J.M. is the minor child of Dennis Mundt and Debra Hennesy (ECF No. 1, ¶ 8). At all relevant times, Mr. Mundt and Ms. Hennesy shared equal parenting time of D.J.M. (*id.*, ¶ 10). However, Ms. Hennesy retained sole medical decision-making authority regarding D.J.M. (*id.*, ¶ 9). Mr. Mundt was suspected of Munchausen syndrome by proxy[2] ("MSBP") and, as such, was restricted to attending one appointment per year with each of D.J.M.'s medical providers (*see id.*, ¶¶ 9, 15).

On November 30, 2020, the Douglas County Department of Human Services ("DCDHS") received a report from D.J.M.'s school expressing concerns about his health (ECF No. 1, ¶ 11; ECF No. 11-2 at 2). Camille Gadziala, a DCDHS caseworker, was assigned to investigate D.J.M.'s case (ECF No. 1, ¶ 5; ECF No. 11-2 at 2). On January 4, 2021, as part of her investigation, Ms. Gadziala obtained D.J.M.'s medical records from

---

[1] The following facts are drawn from Mr. Mundt's Civil Complaint and Jury Demand (ECF No. 1), as well as the exhibits attendant with the instant motion to dismiss (ECF No. 11). In resolving this motion, the Court accepts as true, and views in the light most favorable to the plaintiffs, all factual allegations contained in the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). Further, the Court considers the exhibits without converting this motion into one for summary judgment, since the documents were referred to in the complaint, appear to be central to Mr. Mundt's claims, and their authenticity has not been challenged. *See Hartleib v. Weiser Law Firm, P.C.*, 861 F. App'x 714, 719 (10th Cir. 2021).

[2] "Munchausen syndrome by proxy" is a condition in which a caregiver fabricates or induces symptoms in another person, typically their child, to create the appearance that the child suffers from a real illness and, by extension, to gain sympathy and attention from medical providers. *See* Filho Daniel de Sousa, et al., *Munchausen syndrome and Munchausen syndrome by proxy: a narrative review*, NAT'L LIBR. OF MED., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5875173/ (last accessed Dec. 20, 2023).

Rocky Mountain Pediatric Cardiology, which reflected that D.J.M. had previously complained of chest pains and "tachycardia or dysrhythmia" (ECF No. 1, ¶¶ 19, 21).

On January 5, 2021, Ms. Hennesy emailed Ms. Gadziala to report that Mr. Mundt had MSBP and that, during the preceding week, he had scheduled and attended several medical appointments for D.J.M. without authorization (ECF No. 1, ¶¶ 13–15). Ms. Hennesy further expressed concern that Mr. Mundt might be drugging D.J.M. in order to elicit symptoms and give the appearance that D.J.M. suffered from a serious health condition (*id.*, ¶ 16). That same day, Ms. Gadziala spoke by phone with Nikki Wacker, a nurse at Southeast Denver Pediatrics, who confirmed that while Mr. Mundt could have "no medical decision making whatsoever," he could attend one annual appointment with each of D.J.M.'s providers and, "from their office's point of view, [Mr. Mundt] is in his limitations" (*id.*, ¶¶ 17–18).

On January 6, 2021, Ms. Hennesy reported her suspicions about Mr. Mundt to the Parker Police Department ("PPD") (ECF No. 1, ¶ 24). That afternoon, a PPD officer conducted a welfare check at Mr. Mundt's home and spoke at length with both Mr. Mundt and D.J.M. (*id.*, ¶¶ 27–29; *see generally* ECF No. 11). During the visit, Mr. Mundt told the officer that he was "always worried about [D.J.M.'s] medical treatments due to him not having any medical power," that Ms. Hennesy had failed to seek adequate care for D.J.M. despite his cardiac symptoms "getting progressively worse" (especially after exercising), that he was "worried about [D.J.M.'s] weight," and that D.J.M. was "malnourished" when staying with Ms. Hennesy (ECF No. 11 at 4). Separately, D.J.M. told the officer that he

was "doing fine, since he was not exercising," and the officer observed that D.J.M. "seemed to be in good spirits" (*id.*).

After PPD had completed its welfare check on January 6, Ms. Gadziala petitioned for an *ex parte* emergency removal order that same day (*see* ECF No. 11-2). Mr. Mundt alleges that Ms. Gadziala submitted seven materially false or misleading statements to the court in support of this petition[3] (*see* ECF No. 1, ¶ 31). In particular, the Douglas County District Court's written emergency removal order included the following statements:

- "Throughout this current assessment it has become a concern that [Mr. Mundt] is unnecessarily seeking medical care from various entities for [D.J.M.] and suggesting that [Ms. Hennesy] is not providing adequate medical care for him."

- "Caseworker Gadziala has reviewed documentation and spoken with medical professionals who have not shared any of the concerns that [Mr. Mundt] is making."

- "Recently, [Mr. Mundt] has taken [D.J.M.] to medical appointments without [Ms. Hennesy's] permission or knowledge and has been successful in obtaining additional referrals for the child to see specialists."

- "[DCDHS] is concerned that [Mr. Mundt] is escalating in behaviors of seeking out medical issues that don't exist for the child [D.J.M.], to the point that the child [D.J.M.] is fearful something grave may happen to him if he is not seen by the medical professionals that [Mr. Mundt] is demanding."

- "During a home visit with the child he became tearful when discussing his medical issues that, to him, are unresolved."

---

[3] Mr. Mundt alleges that Ms. Gadziala made seven "problematic statements" to the Douglas County District Court in support of the emergency removal order (*see* ECF No. 1, ¶ 31). Curiously, though, the record reveals that these seven "problematic statements" are quoted directly from *the court's* findings of fact in its written emergency removal order—they are not words attributed to *Ms. Gadziala* herself (*see* ECF No. 11-1 at 2). The parties neither provided nor quoted from a transcript revealing what, if anything, Ms. Gadziala said during the January 6 emergency hearing, nor have they provided a copy of Ms. Gadziala's petition for the emergency removal order.

- Mr. Mundt had initiated a "recent escalation in seeking additional medical professionals and testing" for D.J.M.

- "Reasonable efforts have been made to prevent removal and these have failed."

(ECF No. 11-1 at 2). Based on these statements, the court then issued an emergency removal order for D.J.M. to remain in Ms. Hennesy's custody pursuant to C.R.S. § 19-3-405(2)(b) (*id.* at 3).

Later on the evening of January 6, Ms. Gadziala, accompanied by two PPD officers, went to Mr. Mundt's residence to remove D.J.M. (ECF No. 1, ¶ 32). The officers' body-worn camera footage from that encounter reveals that D.J.M. repeatedly stated that he felt safe living with Mr. Mundt, that "whatever was said about my dad [is false]," and that "[i]f my mom like falsely charges my dad with something, . . . I'm just going to say he's innocent" (*id.*, ¶ 36). D.J.M. also stated that he did not feel safe living with Ms. Hennesy, that "it would be worse there," and that "my mom has lied about things" (*id.*, ¶ 38).

On January 7, 2021, DCDHS filed a petition for temporary custody (ECF No. 1, ¶ 41). The petition was supported by an affidavit from Ms. Gadziala—which, as Mr. Mundt alleges, contained four more materially false or misleading statements (*see id.*, ¶ 43). In particular, the affidavit contained the following statements:

- "Throughout Caseworker Gadziala's assessment, information was gathered from [D.J.M.'s] medical providers[.]"

- "There are concerns based on review of [m]edical records that information provided during these visits are being exaggerated in order for [D.J.M.] to receive additional interventions which may not be necessary."

- "Mr. Mundt's persistence has clearly impacted [D.J.M.'s] perception of his own health issues."

- "Despite court orders, Mr. Mundt continues to push for the highest level of medical intervention for [D.J.M.]."

(ECF No. 11-2 at 2, 3). As a result of DCDHS's petition, Mr. Mundt was ordered to have no contact with D.J.M. (ECF No. 1, ¶ 48).

In the wake of D.J.M.'s emergency removal and the temporary custody order, Ms. Gadziala continued her investigation as part of the ongoing dependency and neglect process. On January 8 and 22, 2021, she called four of D.J.M.'s medical providers, who confirmed that no new referrals to specialists had been made on D.J.M.'s behalf (*see* ECF No. 1, ¶¶ 49–53). Further, on January 7, 2021, D.J.M. underwent a court-ordered hair follicle drug test, which was "negative" for all substances (*id.*, ¶¶ 56–57, 75–76). Ms. Gadziala did not provide the drug test results to the court, nor did she inform the court of what she had learned from D.J.M.'s medical providers following the court's temporary custody order (*id.*, ¶¶ 54, 58, 74).

Meanwhile, Joi Johnson, another DCDHS employee, was assigned as the permanency caseworker to D.J.M.'s case (ECF No. 1, ¶¶ 5, 88). However, Ms. Johnson never met with Mr. Mundt, despite receiving at least five requests for a meeting from Mr. Mundt or his counsel (*id.*, ¶¶ 90–95, 97).

Ultimately, DCDHS dismissed the dependency and neglect action, and Mr. Mundt regained equal parenting time of D.J.M. in October 2021 (ECF No. 1, ¶¶ 80, 85). Mr. Mundt then filed suit against Ms. Gadziala and Ms. Johnson, alleging violations of his Fourteenth Amendment procedural and substantive due process rights, as well as his

Fourth Amendment rights, under 42 U.S.C. § 1983 (*see id.*, ¶¶ 99–142). The instant motion to dismiss followed (*see* ECF No. 9).

## II.  LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g.*, *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation omitted). In assessing a claim's plausibility, "legal conclusions" contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

## III.  ANALYSIS

Having reviewed the parties' briefing, the exhibits attendant with the briefing, the entire case file, and pertinent legal authority, the Court GRANTS Defendants' motion to dismiss as to all claims in the complaint.

### A.  Defendant Johnson is entitled to absolute immunity.

Defendants argue that Ms. Johnson is entitled to absolute immunity because, as the permanency caseworker assigned to Mr. Mundt's dependency and neglect case, her activities in the case were integral to the judicial process. The Court agrees.

"[I]mmunity which derives from judicial immunity may extend to persons other than a judge where performance of judicial acts or activity as an official aid of the judge is involved." *Henshaw v. Bliss*, 421 F. App'x 870, 872 (10th Cir. 2011) (citation omitted); *accord Valdez v. City & Cnty. of Denver*, 878 F.2d 1285, 1287 (10th Cir. 1989) (absolute immunity attaches for agency officials performing acts that are "integral parts of the judicial process").

Here, in his complaint, Mr. Mundt alleges that despite Ms. Johnson being required by law to meet with Mr. Mundt at least once per month, and despite Mr. Mundt requesting to meet on at least five separate occasions, Ms. Johnson never once met with Mr. Mundt (ECF No. 1, ¶¶ 88–95, 97). *See* 12 CCR § 2509-3:7.204(B)(1) ("[A] face-to-face contact is required every calendar month with parent(s)/guardian(s) of the child(ren)/youth."). However, as Defendants correctly observe (*see* ECF No. 9 at 5), the primary purpose of Ms. Johnson's involvement with Mr. Mundt was assisting the court in achieving its permanency goals for D.J.M. *See* C.R.S. § 19-3-702(4)(a) (requiring the court to enter

permanency goals "[i]f the child or youth cannot be returned to the physical custody of the child's or youth's parent or legal guardian"); *see also* 12 CCR § 2509-3:7.204 ("The primary purposes for case contacts shall be to assure child safety and well-being and *move the case toward achieving identified treatment goals and permanency* regardless of the reason the case is open.") (emphasis added). Put more simply, Ms. Johnson, in her role as court-appointed permanency caseworker, was acting "as an official aid of the judge" in the course of Mr. Mundt's dependency and neglect proceedings. *See Henshaw*, 421 F. App'x at 872. Accordingly, Ms. Johnson is absolutely immune from suit.

Despite Ms. Johnson's clear entitlement to immunity, Mr. Mundt cites to *Malik v. Arapahoe County Department of Social Services*, 191 F.3d 1306, 1314 (10th Cir. 1999), for the proposition that immunity does not attach because Ms. Johnson's role in the dependency and neglect proceedings was minimal and "distant from the judicial process." His reliance on *Malik* is misplaced. Per the Colorado Children's Code and related regulations discussed above, the entire purpose of meetings between the child's caregivers and the caseworker is to gather information pertinent to D.J.M.'s safety, well-being, and custodial placement, and to report that information back to the court to aid the court's permanency determination. In this dependency and neglect matter, then, Ms.

Johnson's role[4] in conducting these meetings was "integral to the judicial process," not distant from it. *Valdez*, 878 F.2d at 1287; *see id.* at 1289–90 (government officials enjoy absolute immunity from suit for performing ministerial actions under the direction of a state court judge).

Accordingly, the Court GRANTS Defendants' motion to dismiss as to all claims pertaining to Ms. Johnson.

**B. Defendant Gadziala is entitled to qualified immunity.**

Defendants further argue that Ms. Gadziala is entitled to qualified immunity because Ms. Gadziala's seizure of D.J.M. from Mr. Mundt's custody did not violate any clearly established statutory or constitutional right. Once more, the Court agrees.

When a defendant asserts qualified immunity, the plaintiff must show that the defendant (i) violated a statutory or constitutional right, and (ii) the right was "clearly established" at the time of the defendant's challenged conduct. *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quotation omitted). The Court may address either prong first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013). For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision "on point," or the "weight of authority from other courts must have found the law to be as the plaintiff

---

[4] In fairness, Ms. Johnson's failure to meet with Mr. Mundt may cast doubt on Ms. Johnson's entitlement to immunity, since the conduct being challenged is technically *dereliction*, not fulfilment, of Ms. Johnson's "duty of executing a facially valid court order." *See Valdez*, 878 F.2d at 1286. Still, persuasive Tenth Circuit authority suggests that a social worker who fails to act does not forfeit immunity when the social worker has taken no affirmative action giving rise to the plaintiff's alleged injury. *See Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (in the context of qualified immunity, collecting cases).

maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation omitted). A plaintiff is not required to cite a case with "identical facts" to demonstrate a clearly established right, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020), but clearly established law must place the constitutional issue "beyond debate," *Mullenix v. Luna*, 577 U.S. 7, 16 (2015) (quotation omitted). In analyzing a defendant's motion to dismiss, a court considers whether the complaint's well-pleaded factual allegations and related inferences allege an officer violated a clearly established constitutional right. *See Sanchez v. Hartley*, 810 F.3d 750, 754 (10th Cir. 2016) (citation omitted).

As set forth more fully below, the complaint fails to allege sufficient factual content to establish Ms. Gadziala's violation of any right guaranteed to Mr. Mundt by the Fourth or Fourteenth Amendments. The Court therefore concludes that Ms. Gadziala is entitled to qualified immunity without reaching the "clearly established" prong of the analysis.

### 1. Constitutional or Statutory Violation

#### a. Fourth Amendment seizure

Mr. Mundt first alleges that Ms. Gadziala seized D.J.M. from his custody in violation of his Fourth Amendment rights (ECF No. 1, ¶ 115; *see id.*, ¶¶ 30, 32). Based on the facts alleged in his complaint, however, no reasonable factfinder could perceive a Fourth Amendment violation.

As an initial matter, the Court notes that the Fourth Amendment's strictures apply somewhat differently for law enforcement officers engaged in criminal investigations versus for social workers engaged in child abuse investigations. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248–1250 (10th Cir. 2003) (discussing the difference). For

the latter purposes, a social worker's physical removal of a child from a parent's custody must be supported either by probable cause and a warrant,[5] or by exigent circumstances. *See id.* at 1250 n.23. In this context, "probable cause" refers to the belief that "(1) the child's health or safety was at risk, and (2) this risk was due to the child's presence in the home." *Id.* at 1250.

Here, Mr. Mundt contends that probable cause was absent, in pertinent part, because "not only did [Ms.] Gadziala make at least eleven false statements in Court documents," but "she also intentionally ignored other documents and failed to submit critical evidence to the Court," thus resulting in D.J.M.'s removal from Mr. Mundt's custody (*see* ECF No. 13 at 4; *see also* ECF No. 1, ¶¶ 31, 43). With respect to this "judicial deception" theory, "government officials' procurement through distortion, misrepresentation, and omission of a court order to seize a child is a violation of the Fourth Amendment," but the alleged misstatements or omissions must have been "so probative they would vitiate probable cause." *Malik*, 191 F.3d at 1306 (citations omitted). More specifically, for a Fourth Amendment claim based on "judicial deception" to survive qualified immunity, there must be "a specific affirmative showing of dishonesty" on the social worker's part, and that, "but for the dishonesty, the [child's removal] would not have

---

[5] Although seizures under the Fourth Amendment generally require a warrant, Ms. Gadziala obtained an *ex parte* emergency removal order which, in the context of a child abuse investigation, likely serves as the functional equivalent of a warrant. *See Roska*, 328 F.3d at 1248–49. Separately, the Court notes that Defendants do not appear to argue that Ms. Gadziala's removal of D.J.M. was supported by the exigent circumstances exception to the warrant requirement. As such, the Court addresses itself only to the parties' arguments with respect to the existence of probable cause.

occurred." *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990) (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)).

Furthermore, claims of "judicial deception" based on falsehoods or misrepresentations in affidavits and other court documents are cabined by two additional principles. First, while a social worker's statements in support of probable cause must be truthful "in the sense that the information put forth is believed or appropriately accepted by the [social worker] as true," they need not be truthful in the sense that every fact recited . . . is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the [social worker's] own knowledge that sometimes must be garnered hastily." *Franks*, 438 U.S. at 165. Second, where a social worker receives information from an identified citizen informant, and "it seems reasonable to the [social worker] to believe that the [informant] was telling the truth, they need not take any additional steps to corroborate the information . . . before taking action." *J.B. v. Washington Cnty.*, 127 F.3d 919, 930 (10th Cir. 1997); *accord United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991) ("When an officer has received his information from some person . . . who it seems reasonable to believe is telling the truth[,] . . . he has probable cause.") (citation and internal quotation marks omitted).

In light of the foregoing standards, the Court notes at least two problems with Mr. Mundt's theory of judicial deception. First, his complaint lacks any "specific affirmative showing of dishonesty" in connection with Ms. Gadziala's various statements to the court—i.e., that her evidence supporting D.J.M.'s removal was false, and that she knew

it was false. *See Snell*, 920 F.2d at 698. A close reading of the "eleven false statements in Court documents" cited in the complaint reveals why. As bullet-pointed above, Mr. Mundt attributes eleven statements to Ms. Gadziala,[6] made either in support of the emergency removal order on January 6, 2021, or the subsequent petition for temporary custody on January 7, 2021 (ECF No. 1, ¶¶ 31, 43):

1) **"Throughout this current assessment it has become a concern that [Mr. Mundt] is unnecessarily seeking medical care from various entities for [D.J.M.] and suggesting that [Ms. Hennesy] is not providing adequate medical care for him."** Mr. Mundt disputes this statement because Ms. Gadziala allegedly had only spoken to a single provider (Nurse Wacker), and there is no evidence suggesting that she had reviewed any medical records other than those from Rocky Mountain Pediatric Cardiology. However, as Defendants correctly observe, the "concern" about Mr. Mundt seeking unnecessary medical care for D.J.M. did not arise *solely* from certain healthcare providers or medical records, but was reported directly to Ms. Gadziala by an informant, Ms. Hennesy (*see* ECF No. 1, ¶¶ 14–16; ECF No. 9 at 9). Under the circumstances, Ms. Gadziala was under no duty to verify this concern via other witnesses or documentary evidence before taking protective action on D.J.M.'s behalf. *See J.B.*, 127 F.3d at 930; *Decoteau*, 932 F.2d at 1207.

2) **"Caseworker Gadziala has reviewed documentation and spoken with medical professionals who have not shared any of the concerns that [Mr.**

---

[6] Separate but closely related, the Court notes a further issue with some of the statements that Mr. Mundt alleges to be misleading or false. As discussed above, seven of the statements Mr. Mundt attributes to Ms. Gadziala were actually findings of fact made by the Douglas County District Court in its written emergency removal order (*compare* ECF No. 1, ¶ 31, *with* ECF No. 11-1 at 2). Although the court noted that its findings were made in part after "having heard the statements of Caseworker Camille Gadziala" (*id.*), Mr. Mundt does not specifically identify what false evidence or statements *Ms. Gadziala* presented during the hearing that gave rise to *the court's* "problematic" findings. Mr. Mundt cannot plead Ms. Gadziala's affirmative dishonesty by simply conflating the statements of the court and Ms. Gadziala. *See O'Connell v. Tuggle*, No. 20-1148, 2021 WL 5973048, at *3 (10th Cir. Dec. 16, 2021) (plaintiff had shown that social worker violated a constitutional right by coming forward with social worker's own report and interview notes indicating that parent's confession to child abuse had been fabricated); *Snell*, 920 F.2d at 677 (violation of a constitutional right shown where plaintiff came forward with social worker's application for "pick-up" order containing social worker's own fabricated allegations of child prostitution and child pornography).

**Mundt] is making."** Similar to (1) above, Mr. Mundt disputes this statement because Ms. Gadziala's notes allegedly contain no indication that Nurse Wacker "did not share" Mr. Mundt's concerns about D.J.M.'s health, and because Ms. Gadziala allegedly had only reviewed one set of medical records that supported, not refuted, Mr. Mundt's concerns about D.J.M.'s health. Here, however, Mr. Mundt falsely equates the *absence* of any disagreement between Mr. Mundt and D.J.M.'s medical providers as memorialized in Ms. Gadziala's notes with the notion that Ms. Gadziala simply *fabricated* that disagreement. In the Court's view, this statement does not constitute a "specific affirmative showing of dishonesty" on Ms. Gadziala's part. *See Snell*, 920 F.2d at 698.

3) **"Recently, [Mr. Mundt] has taken [D.J.M.] to medical appointments without [Ms. Hennesy's] permission or knowledge and has been successful in obtaining additional referrals for the child to see specialists."** Mr. Mundt disputes this statement because, in his view, Ms. Gadziala did not have evidence to support the allegation that he took D.J.M. to medical appointments or made referrals on his behalf without authorization. However, as with (1) above, Ms. Gadziala's "evidence" came in the form of Ms. Hennesy reporting these concerns. Probable cause may be founded upon hearsay and reports from informants of precisely this kind. *See Franks*, 438 U.S. at 165; *see also J.B.*, 127 F.3d at 930; *Decoteau*, 932 F.2d at 1207.

4) **"[DCDHS] is concerned that [Mr. Mundt] is escalating in behaviors of seeking out medical issues that don't exist for the child [D.J.M.], to the point that the child [D.J.M.] is fearful something grave may happen to him if he is not seen by the medical professionals that [Mr. Mundt] is demanding."** Mr. Mundt disputes this statement because, in his view, Ms. Gadziala did not have evidence to support the allegations that Mr. Mundt's behaviors were "escalating" or that D.J.M. was "fearful." DCDHS's expression of suspicion or "concern" in these areas, however, is not a conclusive assertion capable of fabrication by Ms. Gadziala. *See Snell*, 920 F.2d at 698 (a claim of judicial deception requires a "specific affirmative showing of dishonesty," not just an unfounded expression of concern).

5) **"During a home visit with the child he became tearful when discussing his medical issues that, to him, are unresolved."** Mr. Mundt disputes this statement because "[t]here is no recording or other confirmed evidence that [D.J.M.] ever became tearful." As with (2) above, Mr. Mundt falsely equates the *absence* of any recorded evidence of D.J.M. crying with the notion that Ms. Gadziala simply *fabricated* D.J.M.'s tearfulness. This equivalence borders on absurdity and, in any event, does not constitute a "specific affirmative showing of dishonesty" on Ms. Gadziala's part. *See Snell*, 920 F.2d at 698.

6) **Mr. Mundt had initiated a "recent escalation in seeking additional medical professionals and testing" for D.J.M.** Mr. Mundt disputes this statement

because, in his view, Ms. Gadziala had no evidence that Mr. Mundt had "escalated" in his attempts to seek unauthorized medical treatment for D.J.M. Notably, however, Mr. Mundt presents this statement without including the rest of the sentence in which it appeared. In its proper context, the statement reads: "With the family's domestic relations court orders citing that [Mr. Mundt] is not to have any involvement in providing information regarding [D.J.M.'s] health, coupled with the previous concerns for [D.J.M.] having marijuana in his system *and this recent escalation in seeking additional medical professionals and testing*, [DCDHS] has growing concerns for the child [D.J.M.'s] safety with [Mr. Mundt]" (ECF No. 11-1 at 1) (emphasis added). As with (4) above, DCDHS's expression of concern for D.J.M.'s safety based on the *combination* of factors listed in that sentence does not amount to a conclusive assertion capable of fabrication. *See Snell*, 920 F.2d at 698.

7) **"Reasonable efforts have been made to prevent removal and these have failed."** Mr. Mundt disputes this statement because, in his view, "Ms. Gadziala made no effort whatsoever to prevent removal before removing [D.J.M.]." The Court has little reason to believe that this statement was anything other than boilerplate language included in the Douglas County District Court's written emergency removal order, not an affirmative instance of dishonesty on Ms. Gadziala's part. Aside from this, other portions of Mr. Mundt's complaint acknowledge the previous measures taken to protect D.J.M. short of removing D.J.M. from Mr. Mundt's custody, such as the court-ordered limitations placed on Mr. Mundt's medical decision-making power (*see* ECF No. 1, ¶¶ 9, 15).

8) **"Throughout Caseworker Gadziala's assessment, information was gathered from [D.J.M.'s] medical providers[.]"** Mr. Mundt disputes this statement because, as with (1) above, Ms. Gadziala allegedly had only spoken to a single provider (Nurse Wacker), and there is no evidence suggesting that she had reviewed any medical records other than those from Rocky Mountain Pediatric Cardiology. Again, however, Mr. Mundt merely excerpts this statement from a sentence in Ms. Gadziala's affidavit. In full, that sentence reads: "Throughout Caseworker Gadziala's assessment, information was gathered from [D.J.M.'s] medical providers, child protection and domestic relations history in both Colorado and Wisconsin, and separate interviews with Mr. Mundt, Ms. Hennesy, and [D.J.M.]" (ECF No. 11-2 at 2). In its proper context, this statement appears to be a broad recitation of the various sources of information Ms. Gadziala relied upon during her investigation, which did include at least one medical provider.

9) **"There are concerns based on review of [m]edical records that information provided during these visits are being exaggerated in order for [D.J.M.] to receive additional interventions which may not be necessary."** Mr. Mundt disputes this statement because, in his view, "[t]here is no evidence that [Ms. Gadziala] possessed any medical records indicating that [Mr. Mundt] was

exaggerating [D.J.M.'s] symptoms." The concern Ms. Gadziala expresses in this portion of her affidavit, however, is not based *solely* on her review of D.J.M.'s medical records, but also on Mr. Mundt's documented history of violating court orders restricting him from communicating information about D.J.M.'s health to his medical providers. Indeed, the language immediately preceding this particular statement—which, notably, Mr. Mundt does not allege is false or misleading— reads: "It's clear based on the orders observed by [Ms. Gadziala] that there is extensive history dating back to when [D.J.M.] was a young toddler. The fact that Mr. Mundt's decision making was restricted to this extent would indicate that there were concerns he continued to communicate excessively regarding [D.J.M.'s] medical needs and continued to do so despite court orders. In the last week, Mr. Mundt has scheduled and attended appointments with each of [D.J.M.'s] providers and communicated information regarding [D.J.M.'s] symptoms" (ECF No. 11-2 at 3).

10) **"Mr. Mundt's persistence has clearly impacted [D.J.M.'s] perception of his own health issues."** Mr. Mundt disputes this statement because D.J.M. had allegedly been diagnosed with legitimate (not merely perceived) medical conditions—tachycardia and dysrhythmia. Once again, however, Mr. Mundt presents this statement divorced from its surrounding context. This portion of Ms. Gadziala's affidavit addressed D.J.M.'s *perception* of his health issues, not whether he in fact had any health issues. Indeed, Ms. Gadziala's full written observations of D.J.M.'s perception of his own health—which, again, Mr. Mundt does not allege are false or misleading—read: "[D.J.M.'s] level of concern for his own health is extremely heightened for a child his age. He believes there is something wrong, but they aren't sure what and expressed concern that something bad might happen if he doesn't receive the medical interventions that Mr. Mundt is asking for. Mr. Mundt's persistence has clearly impacted [D.J.M.'s] perception of his own health issues" (ECF No. 11-2 at 3).

11) **"Despite court orders, Mr. Mundt continues to push for the highest level of medical intervention for [D.J.M.]."** Mr. Mundt disputes this statement because "every single medical provider confirmed that [Mr. Mundt] obtained no additional referrals as a result of his involvement with [D.J.M.'s] medical treatment, and Ms. Gadziala allegedly "failed to correct these errors when she later learned this information." That Ms. Gadziala learned new information about Mr. Mundt's alleged involvement in D.J.M.'s medical appointments and referrals on January 8 and 22, 2021, however, does not mean that she affirmatively misled the court or fabricated information in her earlier-submitted affidavit on January 7, 2021—especially since, at the relevant time, Ms. Gadziala's facts did not necessarily need to be correct in order to be reasonably relied upon in her probable cause determination. *Franks*, 438 U.S. at 165. Moreover, her alleged "fail[ure] to correct these errors" *later*, even if true, does not amount to "a specific affirmative showing of dishonesty" *at the time of D.J.M.'s removal. See Snell*, 920 F.2d at 698.

In view of the foregoing, the Court observes broadly that the "eleven materially false statements in Court documents" Mr. Mundt points to in support of his judicial deception theory (*see* ECF No. 13 at 3), are either (i) improperly attributed to Ms. Gadziala, (ii) mere expressions of concern or suspicion rather than conclusive assertions capable of fabrication or misrepresentation, (iii) misleadingly presented as isolated excerpts rather than in their full context in the language of the Douglas County District Court's emergency removal order and/or Ms. Gadziala's affidavit in support of DCDHS's temporary custody petition. The Court finds that none of these eleven statements make out any "specific affirmative showing of dishonesty" on Ms. Gadziala's part sufficient to support Mr. Mundt's theory of judicial deception.

Much more importantly, the second problem with Mr. Mundt's judicial deception theory is that, even crediting Mr. Mundt's assertions that the statements in Ms. Gadziala's affidavit and other court documents were indeed false, those falsehoods were not "so probative they would vitiate probable cause." *See Malik*, 191 F.3d at 1306. Put differently, probable cause for D.J.M.'s removal existed even independently of Ms. Gadziala's alleged falsehoods. Pertinent here, if an affiant includes false statements in an affidavit, or omits from it information that would vitiate probable cause, the existence of probable cause is measured "by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause." *N.E.L. v. Gildner*, 780 F. App'x 567, 570–71 (10th Cir. 2019) (quoting *Patel v. Hall*, 849 F.3d 970, 982 (10th Cir. 2017)).

Here, as listed above in numbered items (8) through (11), there are four statements that are clearly attributable to Ms. Gadziala herself[7]—i.e., statements in her own written affidavit in support of DCDHS's petition for temporary custody (*see* ECF No. 1, ¶ 43). If the Court assumes, as Mr. Mundt claims, that those four statements are false or "problematic" and sets them aside, what remains is that Ms. Gadziala was aware—based on her personal knowledge of the family's child protection and domestic relations history, as well as her conversations with Nurse Wacker, Mr. Mundt, Ms. Hennesy, and D.J.M.— that Mr. Mundt was suspected of MSBP, that Mr. Mundt's involvement in D.J.M.'s medical care was restricted by court order, that Mr. Mundt had reportedly violated those restrictions on multiple occasions within the previous week, that Mr. Mundt was suspected of drugging D.J.M. to induce symptoms, and that D.J.M. had recently complained of symptoms that mirrored Mr. Mundt's concerns regarding D.J.M.'s purported medical conditions, thereby suggesting that Mr. Mundt was unduly influencing D.J.M.'s perception of his own health (*see, e.g.*, *id.*, ¶¶ 9–11, 13–15; *see also* ECF No. 11 at 4). Based on her own interactions with D.J.M. during a home visit, Ms. Gadziala had also observed firsthand that D.J.M.'s "level of concern for his own health is extremely heightened for a child his age," that he "believes there is something wrong, but they aren't sure what," and that he was fearful that "something bad might happen if he doesn't receive the medical interventions that Mr. Mundt is asking for"—all of which further supported Ms. Gadziala's concern that Mr. Mundt might be manipulating D.J.M. (ECF No. 11-2 at 3). This

---

[7] Again, as opposed to the seven listed statements above that Mr. Mundt quotes from the Douglas County District Court's factual findings in its emergency removal order (*see* ECF No. 1, ¶ 31; ECF No. 11-1 at 2).

combination of factors extant to Ms. Gadziala at the time she petitioned for the emergency removal order lent ample support to her conclusion that D.J.M.'s health or safety was at risk, and that this risk was due to D.J.M.'s presence in Mr. Mundt's custody. *See Roska*, 328 F.3d at 1250. Put more simply, even setting aside the eleven numbered statements above that Mr. Mundt attributes to Ms. Gadziala and alleges to be misleading or false, Ms. Gadziala's removal of D.J.M. was still supported by probable cause.

In sum, Mr. Mundt has not pleaded sufficient factual content to show that Ms. Gadziala's emergency removal of D.J.M. from Mr. Mundt's custody occurred in violation of the Fourth Amendment.

### b. *Fourteenth Amendment substantive due process*

Mr. Mundt further alleges that Ms. Gadziala infringed his and D.J.M.'s "fundamental right to familial integrity" under the Fourteenth Amendment (ECF No. 1, ¶ 108; *see id.*, ¶¶ 106–12). Again, based on the facts alleged in his complaint, the Court disagrees that Mr. Mundt has plausibly alleged this violation.

"The government's forced separation of parent from child, even for a short time, represents a serious impingement on a parent's right to familial association." *Thomas v. Kaven*, 765 F.3d 1183, 1195 (10th Cir. 2014) (internal citation omitted). The right to familial integrity or familial association, however, "is not absolute, but must be weighed against the state's interest in protecting a child's health and safety." *Id.* (citations omitted). As such, to prevail on a "familial integrity" claim grounded in substantive due process, a plaintiff must show (i) that a state official "intended to deprive the plaintiff of a protected relationship with a family member," and (ii) that the official's "intrusion into the relationship

was not warranted by state interests in the health and safety of the family member." *Halley*, 902 F.3d at 1154–55 (citation omitted). Pleading these elements satisfies the Tenth Circuit's "shocks-the-conscience" standard for this substantive due process claim. *Id.*

On this point, Defendants argue that under the familial integrity balancing test set forth above, Ms. Gadziala did not impose an "unwarranted intrusion" into the relationship between Mr. Mundt and D.J.M.—on the contrary, any "intrusion" was occasioned by legitimate concerns for D.J.M.'s welfare (*see* ECF No. 9 at 14–15; ECF No. 16 at 8–9). The Court agrees. As discussed previously, the law provides for the removal of a child upon probable cause to believe that the child's health or safety is at risk due to the child's presence in the parent's or caregiver's home. *See Roska*, 328 F.3d at 1250. And as discussed previously, based on the facts alleged by Mr. Mundt, Ms. Gadziala had probable cause to believe that D.J.M.'s presence in Mr. Mundt's custody posed risks to D.J.M.'s health or safety—among other reasons, because her investigation prior to the emergency removal order suggested strongly that Mr. Mundt (i) had MSBP, (ii) had a documented history of violating his court-ordered restrictions on seeking medical care for D.J.M., (iii) had recently made or attended multiple healthcare appointments for D.J.M. in violation of an existing court order, and (iii) might be coaching or manipulating D.J.M. in order to obtain unnecessary medical treatment. Further, as Defendants aptly put it, D.J.M.'s temporary removal pending the dependency and neglect investigation was warranted under the circumstances, because "[u]nreliable or contaminated evidence resulting from the exercise of undue influence by [Mr. Mundt would] destroy the utility of

[D.J.M.'s] interview and prevent [DCDHS's] employees from ascertaining whether [D.J.M.] was in need of further care and protection" (*see* ECF No. 9 at 15 (quoting *J.B.*, 905 F.Supp. at 986)).

Put simply, under the familial integrity balancing test, Mr. Mundt's complaint does not establish that Ms. Gadziala's "intrusion into the relationship was not warranted by state interests in the health and safety of" D.J.M. *Halley*, 902 F.3d at 1154–55. As such, Mr. Mundt's complaint fails to state a violation of his substantive due process rights.

### c. Fourteenth Amendment procedural due process

Finally, Mr. Mundt alleges that Ms. Gadziala removed D.J.M. from his custody without first engaging in a "full, fair, and adequate investigation" as required by the Fourteenth Amendment (ECF No. 1, ¶ 101; *see id.*, ¶¶ 99–105).

"[A] parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures." *Malik*, 191 F.3d at 1315. Pre-deprivation procedures need not be afforded, however, where there is reasonable suspicion "that the child has been abused or is in imminent peril of abuse"; in such cases, the child's removal followed by a prompt post-deprivation hearing will generally suffice. *See Arredondo v. Locklear*, 462 F.3d 1292, 1297–98 (10th Cir. 2006); *Gomes v. Wood*, 451 F.3d 1122, 1130 (10th Cir. 2006). And, in any event, in determining what process is constitutionally due, the Court balances three interests:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional substitute procedures would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 321 (1796).

In view of these standards, Mr. Mundt's procedural due process claim is fatally flawed. To begin, Defendants recite the many "layers of process" required by Colorado law which DCDHS personnel employed around the time of D.J.M.'s removal, including obtaining an emergency removal order under C.R.S. § 19-3-405(2)(b), petitioning for a temporary custody order under C.R.S. § 19-3-405(2)(a), holding  a post-removal hearing within 72 hours under C.R.S. § 19-3-403(3.5), initiating formal dependency and neglect proceedings after a preliminary investigation (to the extent reasonably possible) under C.R.S. § 19-3-501(1), interviewing and/or observing D.J.M. directly under C.R.S. § 19-3-308(3)(a), and affording Mr. Mundt notice of the allegations and an opportunity to respond, also under C.R.S. § 19-3-308(3)(a) (*see* ECF No. 9 at 12–13).

By contrast, Mr. Mundt fails to identify *any* specific procedure or hearing that the government should have afforded him but did not (*see* ECF No. 9 at 11–14). Instead, his complaint includes a bulleted list of actions that Ms. Gadziala ideally would have taken prior to removing D.J.M., such as interviewing "[Mr. Mundt's] fiancée, relatives, or friends or [D.J.M.'s] classmates, teachers, and other individuals associated with the Boy Scouts," speaking with more or all of "[D.J.M.'s] medical care providers about the veracity of Ms. Hennesy's allegations," or "conduct[ing] a drug test, which would have similarly shed light on the veracity of Ms. Hennesy's allegations" (ECF No. 1, ¶ 103). As Defendants observe, the law did not require Ms. Gadziala to comprehensively review D.J.M.'s full medical records, speak with each of his medical providers, or have him drug tested before seeking an *emergency removal order* to prevent the risk of MSPB-related abuse to D.J.M. while

DCDHS's investigation was pending (*see* ECF No. 9 at 13–14). *See also Arredondo*, 462 F.3d at 1297–98; *Gomes*, 451 F.3d at 1130.

More to the point, the *Mathews* balancing test suggests strongly that Mr. Mundt's procedural due process claim cannot proceed as pleaded. In weighing the required factors, the Court notes the Tenth Circuit's strong admonition that "social workers should be afforded some discretion when they seek to protect a child whose safety may be at risk." *Gomes*, 451 F.3d at 1130; *accord J.B.*, 127 F.3d at 925 ("[C]onsiderable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse.") (citation omitted). Regarding the private interest, Mr. Mundt's interests in the custody, care, and management of his own child without governmental interference are certainly of paramount importance. *See J.B.*, 127 F.3d at 925 (citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)). On the other side, however, the government has a "compelling interest," "acting as *parens patriae*, in protecting children from physical and sexual abuse." *Id.* (citation omitted). Lastly, regarding the risk of error, "[w]hile there is always a risk of error when an emergency removal of a child from his parents' custody is required," DCDHS personnel "substantially reduced that risk at the threshold by the imposition of significant substantive limitations upon the removal authorization"—to wit, obtaining a court order authorizing D.J.M.'s removal on an emergency basis. *Id.*

In sum, under the *Mathews* balancing test and related authority, Mr. Mundt's complaint fails to state a violation of his procedural due process rights.

### *2. Clearly Established Right*

Because the Court determines the Ms. Gadziala's actions did not violate any right enshrined in the Fourth or Fourteenth Amendments, it does not address whether those actions violated clearly established law at the time they took place.

\* \* \*

Based on the foregoing, the Court GRANTS Defendants' motion to dismiss as to all claims pertaining to Ms. Gadziala.

## IV.  CONCLUSION

Consistent with the foregoing analysis, the Court ORDERS as follows:

1.  Defendants' Motion to Dismiss Complaint (ECF No. 9) is GRANTED; and

2.  Defendants' Motion to Stay Discovery Pending Immunity Determination (ECF No. 12) is DENIED AS MOOT.

Dated this 3rd day of January 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge